[No. C028706. Third Dist. Nov. 17, 2000.]

INTERNATIONAL BILLING SERVICES, INC., Plaintiff, Cross-defendant and Appellant, v.
JON EMIGH et al., Defendants, Cross-complainants and Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rule 976.1 of the California Rules of Court, this opinion, including the concurring and dissenting opinion, is certified for publication with the exception of part III of the majority opinion.

1176

## Counsel

Orrick, Herrington & Sutcliffe, Norman C. Hile, Kim J. Mueller and Margaret Carew Toledo for Plaintiff, Cross-defendant and Appellant.

Boutin, Dentino, Gibson, DiGiusto & Hodell, Chris Gibson and Ned M. Gelhaar for Defendants, Cross-complainants and Respondents.

## Opinion

**MORRISON, J.**—In a prior unpublished decision we upheld a judgment in favor of six defendants of liability based on a claimed breach of trade secrecy. (*International Billing Services, Inc. v. North American Capital* (Aug. 25, 1999, C027450).) Three defendants, Emigh, Porter and Qutub (the Engineers) were formerly employed by plaintiff, International Billing Services, Inc. (IBS) and had signed confidentiality agreements in connection with their employment. In postjudgment proceedings, the trial court awarded the Engineers attorney fees. IBS appeals, contesting the award on several grounds. We shall affirm.

In the published portion of this opinion, we conclude, contrary to some cases, that a party's claim of entitlement to attorney fees based on a breach of contract containing a fees provision judicially estops that party from

contending the provision does not authorize an award of attorney fees. We also conclude the Engineers are entitled to fees from IBS even though the Engineers' fees were actually paid by a third party during the litigation.

## FACTUAL AND PROCEDURAL BACKGROUND

IBS processes confidential information provided by customers, for use in preparing billing statements. IBS also develops technology for use in processing billing statements. The Engineers worked on various aspects of IBS's technology. A key machine used in the business is the inserter, or envelope-stuffer. IBS developed a set of modifications to a standard inserter, the Phillipsburg, which it uses in its own mail processing facility. IBS did not market its technology.

The Engineers left IBS and reorganized into an existing company, North American Capital (NAC), run by Norman Banks (Banks) and partly owned by Pacific First Equity (PFE). Within a short time they developed a set of Phillipsburg modifications they called the "Pinnacle," which they marketed.

IBS sued the Engineers, as well as Banks, PFE and NAC, alleging the Pinnacle encompassed proprietary technology.

The relevant complaint employs the disfavored shotgun (or "chain letter") style of pleading, wherein each claim for relief incorporates by reference all preceding paragraphs, which often masks the true causes of action. (See *Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 285 [186 Cal.Rptr. 184].) The complaint sets forth several legal theories or claims, as follows:

(1) Misappropriation of trade secrets, against all defendants;

(2) Unfair competition, based on the alleged misappropriation, against all defendants;

(3) Breach of the confidentiality agreements, against the Engineers, consisting of disclosure and improper use of "confidential and proprietary information";

(4) Interference with contractual relations against NAC and Banks, by their alleged inducement of the disclosure of trade secrets by the Engineers;

(5) Interference with prospective advantage, against all defendants, based on misappropriation of trade secrets and pursuit of plaintiff's "existing or prospective competitors"; and

(6) Breach of the fiduciary duty by the Engineers to keep trade secrets.

IBS sought an injunction and included in its prayer a request for "attorneys" fees incurred in this action and all other costs of the action.

Attached to the complaint are copies of the "Confidential Information and Invention Agreement," signed by the Engineers while employed by IBS. It is a concise document, slightly over one page long. It has two parts, "Confidential Information" and "Inventions." The main heading under "Confidential Information" states in capital letters, "YOU PROMISE COMPANY THAT YOU WILL PROTECT COMPANY'S AND ITS CUSTOMERS' CONFIDENTIAL INFORMATION IN ACCORDANCE WITH THIS AGREEMENT." The last paragraph states "After You cease to be an employee of Company, regardless of the reason for the ending of employment, You agree to hold all Confidential Information in trust and confidence for Company and not to use such Confidential Information other than for the benefit of Company. Except as authorized in writing by an officer of Company, You agree not to disclose or divulge any Confidential Information, by publication or otherwise, to any person or entity. You promise to reimburse Company for any legal fees, liability, or loss which Company incurs as a result of any unauthorized disclosure or use of Confidential Information by You." For convenience we refer to this as the "fees provision," although whether it *is* a fee provision is contested. The "Inventions" portion of the agreement does not contain a similar provision.

The defendants other than PFE cross-complained for declaratory relief. Both sides sought fees. IBS urged the trial court to award it fees, either for malicious misappropriation (see Civ. Code, § 3426.1) or by virtue of the contractual fees provision, arguing as follows: "Regardless of whether this Court finds defendants' misappropriation to be 'willful and malicious,' if the Court finds that [the Engineers] breached the confidential information agreements, then IBS is entitled to attorney's fees. The agreement provides: 'You promise to reimburse Company for any <u>legal fees</u>, liability, or loss which Company incurs as a result of any unauthorized disclosure or use of Confidential Information by You.' Exhibits 3-7 (emphasis added)."

After defendants prevailed at the six-week trial, the Engineers moved for an award of attorney fees. In part, the Engineers urged IBS was estopped to deny the supposed effect of the fees provision.

The motion for fees contained declarations describing the fees, including a declaration by a shareholder of McDonough, Holland & Allen, attesting to the reasonableness of the fees, and declarations by each of the Engineers.

IBS opposed the motion on many grounds, including the following grounds pursued on appeal:

(1) The contract did not provide for a fees award;

(2) The Engineers did not pay any fees to the Boutin firm, which handled the trade secrets litigation;

(3) Fees paid to Lothrop & West, patent attorneys, were not paid by the Engineers, who had no obligation to pay these fees;

(4) Some of the fees requested were for work "outside the scope of the lawsuit," meaning patent work and negotiations with Bell & Howell about buying technology;

(5) Some of the fees were for noncontract claims;

(6) Some of the fees were for "services rendered" to non-Engineer defendants.

In support of its opposition, IBS showed the fees were paid by NAC, under written "Terms of Engagement" with the Boutin firm, stating "Each of you is ultimately responsible for payment of our fees. However, we will send our bills to North American Capital, which will have the responsibility to pay our bills." The engagement letter was signed by the Engineers and by Banks, individually and as CEO of NAC and of PFE. In discovery, the Engineers had produced promissory notes of NAC, supported by personal guaranties by the Engineers and others.

In reply, the Engineers urged that because the fees provision was ambiguous, it should be construed against the drafter, IBS. IBS was not entitled to avoid the fees provision simply because the company the Engineers now worked for actually *paid* the fees, and the Engineers claimed they "fully intend to reimburse NAC with the attorney's fees they are awarded [citation] and might be subject to an equitable subrogation claim by NAC if they did not." The Engineers each provided a declaration of his intention to use any fee award to pay NAC. They urged there was no basis for apportionment among the counts or parties.

At oral argument in the trial court, *IBS conceded it had drafted the contract and ambiguities could properly be read against it,* but urged the language of Civil Code section 1717 (section 1717) controlled. IBS urged "unless this provision comes within the specific language that is required by 1717, it

does not satisfy the attorney's fees part." The Engineers urged IBS's request for fees acted not only as an estoppel, but also evidenced the understanding of the parties to the contract. The trial court awarded fees of $513,224.30. IBS timely filed its notice of appeal.

## DISCUSSION

## I

██ Parties may agree by contract for the payment of attorney fees in actions relating to the contract. To avoid the perceived unfairness of one-sided attorney fee provisions, the Legislature enacted section 1717, which provides if a contract gives one party the right to recover attorney fees in an action arising out of the contract, the other party, upon prevailing, is entitled to fees.

Section 1717, subdivision (a) provides in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." Further, to avoid cases where a fees provision may be limited to the portion of a contract which only one side is likely to litigate, section 1717, subdivision (a) also provides: "Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract."

The paragraph in contention states: "After You cease to be an employee of Company, regardless of the reason for the ending of employment, You agree to hold all Confidential Information in trust and confidence for Company and not to use such Confidential Information other than for the benefit of Company. Except as authorized in writing by an officer of Company, You agree not to disclose or divulge any Confidential Information, by publication or otherwise, to any person or entity. *You promise to reimburse Company for any legal fees, liability, or loss which Company incurs as a result of any unauthorized disclosure or use of Confidential Information by You.*" (Italics added.)

The portion we have italicized differs from the typical fees provision, in that it uses the phrase "promise to reimburse." IBS claims this makes the

provision an indemnity clause and—in IBS's view—an indemnity clause cannot also serve as a fees provision. Accordingly, the reciprocity statute (§ 1717) has no application and the Engineers are not entitled to fees.

We disagree with this view for three reasons.

### A

First, there is no magic formulation for a fees provision. The language used here conveys the notion that breach of confidentiality will have serious repercussions, including the need to reimburse IBS for its legal fees in the event of suit. The use of "reimburse" does not compel the conclusion the provision is simply an indemnity provision. Cases deciding whether given language comprised an indemnity clause consider whether the language was intended to operate between the contracting parties, or only as against nonparties. (See *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 508-509 [61 Cal.Rptr.2d 668] [provision "is intended to entitle Continental to attorney fees in any action it brings against Amtech for breach of any provision of the contract"]; cf. *Building Maintenance Service Co. v. AIL Systems, Inc.* (1997) 55 Cal.App.4th 1014, 1030 [64 Cal.Rptr.2d 353] ["there is no language in paragraph 13 which reasonably can be interpreted as addressing the issue of an action between the parties"]; *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 974 [17 Cal.Rptr.2d 242] (*Myers*) [provision deals "only with third party claims"].)

The Engineers promised "to reimburse Company for any legal fees, liability, or loss which Company incurs as a result of any unauthorized disclosure or use of Confidential Information by" them. This covers legal fees incurred in suits by IBS against the employee as well as legal fees incurred in suits by IBS against third parties to prevent the dissemination of information wrongly disclosed by the Engineers. In fact, this suit was brought against the Engineers (employee-signatories) and against third parties who had not signed agreements with IBS. We conclude the reasonable meaning of the agreement, as the parties would have understood it at the time of contracting, provides for attorney fees. (See Civ. Code, §§ 1638, 1644; *Thomas v. Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 816 [297 P.2d 768].)

Because section 1717 states a contract must "specifically provide" for a fees award, IBS contends the statute does not come into play unless a given provision uses the *specific* terms contained in the statute, viz., "attorney's fees," "incurred to enforce" a contract. Not so. There is no legislative form

language required by section 1717, so long as the agreement authorizes an award of fees incurred to enforce the contract. The language of this agreement did so.

In the reply brief IBS contends the fact the "Inventions" portion of the agreement did not contain a similar provision leads to the conclusion this provision was not intended to function like an ordinary fees provision, and suggests alternative ways it would or might have drafted the agreement had that been its intention. This overlooks the part of section 1717 which provides, "Where a contract provides for attorney's fees . . . that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation . . . ."

## B

Second, the Engineers make the persuasive argument that the meaning of the clause is at least ambiguous. Because IBS drafted the clause, it should be construed against IBS. (See Civ. Code, § 1654 ["In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist"]; *Pacific Lbr. Co. v. Ind. Acc. Com.* (1943) 22 Cal.2d 410, 422 [139 P.2d 892]; *SDC/Pullman Partners v. Tolo Inc.* (1997) 60 Cal.App.4th 37, 45 [70 Cal.Rptr.2d 62].)

IBS contends this interpretive rule does not apply because *in other cases* it *would benefit IBS* to construe the provision as a fees provision. (Citing principally *B. L. Metcalf General Contractor, Inc. v. Earl Erne, Inc.* (1963) 212 Cal.App.2d 689, 696 [28 Cal.Rptr. 382] [involving scope of arbitration provision, "it happens in this case [one party] prefers not to have arbitration, yet in a contract involving the identical language and involving a similar set of facts another [party] might well prefer to have arbitration"].) Although the point has superficial appeal, it is not without doubt, because a court normally considers the parties before it when construing a contract. (See Rest.2d Contracts, § 206, com. (a), p. 105 [this rule's "operation depends on the positions of the parties as they appear in litigation, and sometimes the result is hard to distinguish from a denial of effect to an unconscionable clause"].) But IBS does not explain where this point was made in the trial court. In fact at the hearing in the trial court, counsel for IBS agreed (with "a couple of caveats") with the trial court's statement "that to the extent this agreement is ambiguous, that it has to be and should be interpreted against you, since you were the party that prepared it?" Neither of the "caveats" raised the issue now tendered, viz., the limitation on the interpretive rule. Moreover, although the trial court expressly relied on this interpretive rule, IBS failed to

address it in its opening brief. This deprived the Engineers of the opportunity to address the contention in this court and constitutes a waiver. (*Kahn v. Wilson* (1898) 120 Cal. 643, 644 [53 P. 24].) The same is true of the claim the rule should not be applied because two of the Engineers had previously signed agreements after deleting the language at issue, though, in fairness to IBS, this last claim is more closely directed at a red-herring "adhesion" argument raised by the Engineers. Given this state of the record, we decline to conclude it is normally "bad" for an employee to have an agreement with his employer which provides for a fees award, and decline to conclude the trial court should not have accepted counsel's concession that the interpretive rule could properly be invoked in this case.

Further, another rule used to resolve ambiguities is to look at how parties treated a condition. To the extent IBS contends the clause is unambiguous, it is enough to say IBS itself sought fees under this provision, not as indemnity, but as a normal contractual fees provision. (See *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171] [" 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. . . . [¶] . . . Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean"].)

IBS contends the relevant complaint does not specify the basis for its request for fees and points out, correctly, that fees were theoretically available pursuant to the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) in the event IBS had prevailed in the case. Such fees are not routine, but only awarded in the case of "willful and malicious" misappropriation or the bad faith claim of misappropriation (*id.*, § 3426.4), which explains why the trial court did not award the Engineers fees on this alternate rationale. IBS's point is unavailing because the complaint adequately tendered the claim of fees pursuant to contract, even though it *also* tendered the Trade Secrets Act theory. (See *Perry v. Robertson* (1988) 201 Cal.App.3d 333, 340-341, 342 [247 Cal.Rptr. 74].) Further, IBS consistently maintained in the trial court fees were authorized by the contract provision—at least, consistently until it lost on the merits. For example, IBS's concluding trial brief argues, under the heading "Attorney's Fees," "Regardless of whether this Court finds defendants' misappropriation to be 'willful and malicious,' if the Court finds [the Engineers] breached the confidential information agreements, then IBS is entitled to attorneys' fees. The agreement provides: 'You promise to reimburse Company for any legal fees, liability, or loss which Company incurs as a result of any unauthorized disclosure or use of Confidential Information by You.' " At oral argument in the trial court, IBS conceded it

had asserted the provision was a fees provision. Unless IBS is now taking the position its claim in the trial court was wholly frivolous, we must conclude IBS concedes the provision is at least ambiguous and susceptible of the meaning IBS previously asserted, viz., it can be a fees provision. We conclude the trial court properly interpreted the provision to specifically provide for fees incurred to enforce the contract.

## C

Third, IBS is estopped from denying that the contract contains an attorney fees clause. The prayer in the first amended complaint sought the payment of fees. Although the language of the prayer was not specific and there was an alternate ground for the award of attorney fees pursuant to Civil Code section 3426.4 for alleged willful and malicious appropriation of trade secrets, the plaintiff attached the contract to its complaint and in its concluding trial brief it clearly and unambiguously requested an award of fees based on language in the "Confidential Information and Invention Agreement." The purposes of section 1717 are thwarted when a party is able to use the threat of fees as a club, and seek to avoid liability for fees later.

Judicial estoppel was briefed and argued in the trial court. The trial court was not in a position to depart from precedential decisions of other California Courts of Appeal. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) This court invited supplemental briefs to give the parties an opportunity to flesh out the point, which was mentioned but not thoroughly analyzed in the original briefs. (See *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 129 [3 Cal.Rptr.2d 275].) We did so because the question whether a given provision *is* a fees provision, which one might think was readily ascertainable, results in frequent, protracted, litigation which ties up the courts and parties long after the merits of a decision are settled. Time and again in civil cases, often those with parties willing and able to spend thousands or tens of thousands of dollars on the issue, the fees debate assumes a life of its own. "The prospect of court-awarded attorney fees plays a significant part in determining a strategy for initiating or defending litigation. Litigation costs (including the potential fee award) can be enormous, sometimes rivaling or even exceeding the amount involved on the merits. . . . [¶] Therefore, in planning to initiate or respond to litigation, it is critical to determine whether a statute, a common-law theory, or a contractual provision might provide for some form of fee-shifting." (Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 1999) Overview, § 1.2, p. 1-3 (Pearl).) One purpose of section 1717 is to *avoid* uncertainty and clarify the issue of fees, so both sides can make rational

evaluations about the case, including prospects of settlement and so forth. The very squabbling contained in the numerous cases discussed above and in the briefs but not mentioned in this opinion shows that fee litigation has become a specialty of some lawyers and a "fees phase" of cases is foreordained. This wasteful consumption of judicial resources and client money serves no public purpose and impairs the image of the legal profession.

The classic example, Bleak House, is worthy of mention. Dickens paints a picture of the lawyers leaving Chancery, laughing, at the conclusion of *Jarndyce v. Jarndyce*: the trust corpus is exhausted by fees so the case has been dismissed. (Bleak House, ch. LXV; see *Kerper v. Kerper* (Wyo. 1991) 819 P.2d 407, 408, fn. 2.) This image of the legal profession, though rarely accurate, is persistent, and any step which fairly can be taken to reduce litigation over fees is a good step. We take such a step now.

We emphasize the following discussion applies only where a party brings a breach of contract action and the contract contains some provision which the party asserts operates as a fees provision. Attaching the contract to the complaint is customary, but not required; the essential terms may be pleaded *in haec verba* or, if done cautiously, the import of the terms may be pleaded. (See 4 Witkin, Cal. Procedure (4th. 1997) Pleading, §§ 479-480, pp. 572-573.) In this case, IBS sued the Engineers in part for breach of contract, attached the contract to the complaint, and alleged it was entitled to "attorneys' fees incurred in this action and all other costs of the action[.]" This is standard language used to claim fees pursuant to a written contractual attorney fees provision as contemplated by section 1717. It is not a claim for indemnity, and IBS conceded at oral argument that the *complaint does not plead indemnity*. (Cf. 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 879(2), p. 337 [must plead "failure of indemnitor to indemnify"].) In its trial brief, it clearly and unambiguously sought "attorney's fees," quoting the contractual language, with no mention of "indemnity." Later, after losing on the merits, IBS backpedaled and claimed the language of the contract did not provide for fees under section 1717, but only qualified as an indemnity provision.

Generally, where the losing party would have obtained fees had it won, it is liable for fees if it lost, such as where a nonsignatory to a contract asserts entitlement to fees based on a contract, loses the case, then seeks to avoid an adverse fee award. (See Pearl, *supra*, Attorney Fee Awards Based on Contract, § 6.12, pp. 6:12 to 16.) The reciprocity provision of section 1717 was designed to prevent overreaching in litigation. Absent the reciprocity provision, contracting parties with superior economic bargaining power would

routinely insert one-sided fees provisions in contracts. In the event of a dispute, and regardless of the merits *vel non* of the disputant's claims, the drafting party would have an unfair litigation advantage from the outset: Even if it lost, it would only have to pay contract damages; if it won, the weaker party would also have to pay fees. "One-sided attorney's fees clauses can thus be used as instruments of oppression to force settlements of dubious or unmeritorious claims. [Citations.] Section 1717 was obviously designed to remedy this evil." (*Coast Bank v. Holmes* (1971) 19 Cal.App.3d 581, 596-597 [97 Cal.Rptr. 30], approved by *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 128 [158 Cal.Rptr. 1, 599 P.2d 83] ["to prevent oppressive use of one-sided attorney's fees provisions"].) Thus, section 1717 represents an important public policy protecting those "who may be in a disadvantageous contractual bargaining position . . . ." (*Coast Bank v. Holmes, supra,* 19 Cal.App.3d at p. 597, fn. 3, approved by *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1091 [95 Cal.Rptr.2d 198, 997 P.2d 511] (*PLCM Group*).)

Section 1717 encourages the application of equitable considerations to advance its remedial purposes. (*PLCM Group*, *supra,* 22 Cal.4th at p. 1091; *International Industries, Inc. v. Olen* (1978) 21 Cal.3d 218, 224 [145 Cal.Rptr. 691, 577 P.2d 1031].)

We agree with the general observation of the Engineers: "If a party to a contract can claim a right to recover attorney's fees pursuant to a provision in a contract and then deny the effect and application of that provision if his opponent prevails, section 1717's purposes would be thwarted and attorney's fees claims could be used as instruments of oppression. Specifically, uncertainty about a party's rights and obligations with respect to ultimate recovery of attorney's fees would create pressure to settle unmeritorious claims."

We acknowledge a party is permitted—sometimes encouraged—to plead alternative and inconsistent theories in a given proceeding, " 'which can then, under appropriate judicial control, be evaluated as such by the same tribunal, thus allowing an internally consistent final decision to be reached.' " (*Jackson v. County of Los Angeles* (1998) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96] (*Jackson*).) But, as the Engineers maintain, "For section 1717 to function as intended, parties need reasonable prospective assurance of whether they will or will not be able to recover their attorney's fees if they win, and whether they will have to pay their opponent's fees if they lose." Sauce for the goose is sauce for the gander or, "Same monks, same haircuts." (See *Newman v. Checkrite California, Inc.* (E.D.Cal. 1994) 156 F.R.D. 659, 660, fn. 1.) The in terrorem effect of uncertainty should not

be underestimated. Here, although "the [loser] possessed no evidence to support its cause of action it was capable of alleging sufficient facts in its pleadings to force the [prevailing party] to wage a defense." (*Jones v. Drain* (1983) 149 Cal.App.3d 484, 489 [196 Cal.Rptr. 827]; see *Manier v. Anaheim Business Center Co.* (1984) 161 Cal.App.3d 503, 508 [207 Cal.Rptr. 508].)

Some cases have rejected an estoppel theory because "mere allegation of a contractual right to attorney fees is not sufficient to create an estoppel where [a party] would not *actually* have been entitled to attorney fees under the contract if Interface had prevailed." (*Myers, supra,* 13 Cal.App.4th at p. 962, fn. 12, original italics; see also *Alhambra Redevelopment Agency v. Transamerica Financial Services* (1989) 212 Cal.App.3d 1370, 1381 [261 Cal.Rptr. 248] (*Alhambra*); *Leach v. Home Savings & Loan Assn.* (1986) 185 Cal.App.3d 1295, 1304-1307 [230 Cal.Rptr. 553].)

This makes little sense: Why would any party need to estop another party, where the provision actually—clearly—provided for fees? The *point* of an estoppel is to prevent a party from litigating an issue: Estoppel *is not* dependent on the potential merits of a claim but depends on the manner in which a claim is raised or not raised. (See generally 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, §§ 176-177, pp. 857-860.) We have no quarrel with the cases holding section 1717 was not designed "to extend the right to recover attorney fees to persons who themselves could not have been required to pay attorney fees in the event their adversary prevailed in the action, . . ." (*Saucedo v. Mercury Sav. & Loan Assn.* (1980) 111 Cal.App.3d 309, 315 [168 Cal.Rptr. 552]; see *Alhambra, supra,* 212 Cal.App.3d at p. 1381.) But where a claim of entitlement to fees is asserted, prevailing on such claim does result in a fee award, which means if the claimant loses, the opponent should get fees.

IBS contends binding California Supreme Court cases referring to actual entitlement to fees precludes reliance on an estoppel theory. In *Reynolds Metals Co. v. Alperson, supra,* 25 Cal.3d 124, 128, the court did state: "Its purposes require section 1717 be interpreted to further provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant." The court has again recently made this general observation: "The goal of section 1717 is full mutuality of remedy between parties to a contract, whether plaintiffs or defendants, in the matter of attorney fees. [Citation.] 'To achieve its goal, the statute generally must apply in favor of the party prevailing on a contract claim whenever that party would have been liable

under the contract for attorney fees had the other party prevailed.' " (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1113-1114 [86 Cal.Rptr.2d 614, 979 P.2d 974].) We disagree with IBS's claim these general observations resolve or even address the issue here presented. ■ "A decision is not even authority except upon the point actually passed upon by the Court and directly involved in the case." (*Hart v. Burnett* (1860) 15 Cal. 530, 598.)

■ We do not interpret these cases to mean a provision must be found to provide for fees; rather, a party's legal theory (breach of a contract containing a fees provision) must encompass fees. Where a party claims a contract allows fees and prevails, it gets fees. Where it claims a contract allows fees and loses, it must pay fees. This interpretation is consistent with the rule the California Supreme Court characterizes as "settled," to the effect "that a party is entitled to attorney fees under section 1717 'even when the party prevails on grounds the contract is . . . nonexistent, if the other party would have been entitled to attorney's fees had it prevailed.' " (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 [39 Cal.Rptr.2d 824, 891 P.2d 804]; see *Santisas v. Goodin* (1998) 17 Cal.4th 599, 610-611 [71 Cal.Rptr.2d 830, 951 P.2d 399]; see also *Care Constr., Inc. v. Century Convalescent Centers, Inc.* (1976) 54 Cal.App.3d 701, 705 [126 Cal.Rptr. 761] ["if Care had been able to convince the trial court that there was a valid lease . . . then Care would have been able to recover attorney's fees under the lease provision. Care contends, however, that since the trial court found that there was not a valid lease then no attorney's fees can be awarded to Century. . . . [W]e think the only way of carrying out the purpose of mutuality found in Civil Code, section 1717, is by holding that Century is entitled to attorney's fees"]; *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111 [51 Cal.Rptr.2d 286] ["Since it is undisputed that Fred Abdallah would have been entitled to fees if he had been a prevailing party, there is no question that he is liable for fees as a losing party"].)

■ The word "estoppel" has meanings which vary by application. Ordinary "equitable estoppel" entails detrimental reliance by one party, but "judicial estoppel" does not. (See *Edwards v. Aetna Life Ins. Co.* (6th Cir. 1982) 690 F.2d 595, 598 [distinguishing the two, "Unlike equitable estoppel, judicial estoppel may be applied even if detrimental reliance or privity does not exist"]; *Jackson, supra,* 60 Cal.App.4th at pp. 182-183.) In California, judicial estoppel has been justified because it prevents fraud on the courts and will "prevent injury to an *innocent* litigant." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850 [21 Cal.Rptr.2d 642], original italics.)

In some jurisdictions, judicial estoppel requires a prior success on the fact asserted. In this respect, it works as a corollary to issue preclusion. This

assumes the estoppel works, if at all, only in subsequent litigation or proceedings, but this is not always so. (See *Schulze v. Schulze* (1953) 121 Cal.App.2d 75, 83 [262 P.2d 646] ["The defendant may not play fast and loose with the court in this fashion. He cannot in one breath say the judgment is valid,—obtain relief thereby; and in the next, say it is invalid. Having relied on the validity of the judgment of divorce on the first motion, he is estopped from thereafter claiming it is void."].) The doctrine " ' "is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. . . ." ' " (*Jackson, supra*, 60 Cal.App.4th at p. 181.) " 'It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite.' " (*Ibid.*; see *id.* at pp. 183-184, fn. 8 ["circumstances may warrant application of the doctrine even if the earlier position was not adopted by the tribunal"].) The principle is not limited to successive actions. (See *Pegram v. Herdrich* (2000) 530 U.S. 211, 227, fn. 8 [120 S.Ct. 2143, 2153, 147 L.Ed.2d 164, 180] ["Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase"]; *Allen v. Neal* (1965) 217 Tenn. 181, 186-187 [396 S.W.2d 344, 346-347]; *Ray v. Midfield Park, Inc.* (1972) 289 Ala. 137, 142 [266 So.2d 291, 295-296].)

 In our view, IBS's position is unfair. A pleader should not be permitted to threaten a litigant with the prospect of an adverse attorney fees award and avoid the same fate if unsuccessful. (Again, we point out IBS concedes it did *not* seek indemnity in the complaint based on this provision.) Such an outcome advances no tenable public policy, but rewards oppressive litigation practices. "If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men, honest and dishonest, are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come or are brought before them. [¶] It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the court of a litigation must act consistently with it; one cannot play fast and loose." (Bigelow, Law of Estoppel (6th ed. 1913) ch. 25, p. 783, fns. omitted.)

The California Supreme Court has recognized the policy indicating the mere threat of an attorney fees award alters the dynamics of litigation. (*Reynolds Metals Co. v. Alperson, supra*, 25 Cal.3d at p. 128.) Given section

1717, prejudice, if required to be shown, should be presumed from the unambiguous assertion of the right to fees pursuant to a contract provision. Any other conclusion would frustrate the policy set by the Legislature.

This conclusion regarding judicial estoppel should reduce protracted litigation regarding the precise scope of a fees provision and provide parties necessary certainty. Further, it is consistent with the rule, discussed above, that a party who demonstrates a contract *does not exist* is entitled to fees if the profferor claimed fees pursuant thereto.

## II

■ IBS contends the Engineers did not "incur" any fees within the meaning of section 1717, because NAC *paid* the fees.

The legal services agreement made the Engineers jointly and severally liable for legal services rendered by the Boutin firm. However, the fee agreement bound Boutin to look first to NAC for payment, and NAC actually did pay all the fees.

The provision at issue required the Engineers to "reimburse Company for any legal fees, liability, or loss which Company incurs," and, by virtue of the reciprocity provision of section 1717, that is the scope of IBS's liability.

To "incur" means "To run or fall into (some consequence, usually undesirable or injurious); to become through one's own action liable or subject to; to bring upon oneself." (5 Oxford English Dict. (2d ed. 1933) p. 188, col. b.; see Black's Law Dict. (7th ed. 1999) p. 771, col. b ["To suffer or bring on oneself (a liability or expense)"]; 1 Abbott's Law Dict. (1879) p. 595, col. b. [liability "cast upon them by act or operation of law"].) The California Supreme Court has construed the term as used in section 1717 to mean generally " 'become liable' for" a fee, "i.e., to become obligated to *pay* it." (*Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259] (*Trope*).)

Here, the Engineers became *liable to pay* the fee even if they were not the source of payment the attorney agreed to look to first. Therefore they incurred the fees and, by virtue of the reciprocity provision of section 1717, they are entitled to an award of fees. Recall that section 1717, subdivision (a) provides in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then *the party who is determined to be the party prevailing*

*on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.*" (Italics added.) Thus, by statute, the prevailing party is "entitled to reasonable attorney's fees," providing only the fees provision itself provides for fees incurred to enforce the contract.

In *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397 [235 Cal.Rptr. 165], an unsuccessful plaintiff suing on a contract containing a fees provision challenged the trial court's award of fees because the fees would go to defendant's insurance carrier. The court concluded (at p. 1409) the particular provision at issue did not require fees to be incurred, "rather, it provides that the losing party will pay reasonable fees as determined by the court." The court went on to say (at p. 1410): "Assuming plaintiffs did establish that the fees ultimately went to Farmers Insurance Company, we can perceive of no reason why plaintiffs should profit from defendant Hoefke's foresight in obtaining insurance coverage. Plaintiffs were not entitled to avoid their contractual obligation to pay reasonable attorney fees based on the fortuitous circumstance that they sued a defendant who obtained insurance coverage providing a defense." The leading treatise points out the claim "that a losing party . . . should not have to pay attorney fees if the prevailing party did not, in fact, have to pay" them "has been rejected numerous times." (Pearl, *supra*, Attorney Fee Awards Based on Contract, § 6.16, p. 6-20.)

It is difficult to see how IBS is aggrieved by the serendipity of the Engineers, who discovered how to defend the lawsuit without having to pay out of their pockets.

IBS, pointing to the rule that payment of a joint obligation by one party relieves the others of liability, contends "There is no law to support the proposition that 'incurred' also includes some abstract notion of liability where the bill for attorney's fees has already been paid by a different party, thus extinguishing any liability of the party for the attorney's fee bill." IBS assumes that because the bills have now been paid, any "liability" the Engineers have has disappeared and an award of fees would be a windfall. IBS characterizes the extant liability of the Engineers as "zero," therefore the fee award in an amount greater than zero was excessive.

It is IBS which seeks a windfall. After bringing a suit and demanding fees, IBS wants to avoid paying the prevailing party fees based on the "fortuitous circumstance" the Engineers had arranged a means of defending themselves from this nonmeritorious lawsuit. (*Staples v. Hoefke, supra*, 189 Cal.App.3d at p. 1410.) The fact remains if NAC failed to pay, the Engineers were

throughout the litigation contractually obligated to step in and fund the defense of the lawsuit. That contractual obligation was a liability. The fact no bills remained unpaid at the time of the award does not change this result.

IBS's reliance on *San Dieguito Partnership v. San Dieguito River Valley Regional etc. Authority* (1998) 61 Cal.App.4th 910 [72 Cal.Rptr.2d 91], is puzzling. That decision concluded a party could not obtain a *multiplier* of fees, reasoning a court had no discretion to award more than a party "incurred." Here, the fee award was based on actual time spent at specified rates. Further, the decision has been disapproved: "Our reference in *Trope* to the general definition of 'attorney's fees' as the sum a litigant 'actually pays or becomes liable to pay' for legal representation (11 Cal.4th at p. 280), was not intended to imply that fees can be recovered only when, and to the extent that, a litigant incurs fees on a fee-for-service basis, a question not raised therein." (*PLCM Group, supra,* 22 Cal.4th at p. 1097, fn. 5, expressly disapproving *San Dieguito.*)

IBS makes another, narrower, objection: The fees provision speaks in terms of reimbursement of fees. Reimbursement ordinarily means to pay back or refund. Since the Engineers never actually paid fees, there is nothing to refund to them. In our view this reads "incurs" out of the agreement, and is largely another iteration of the indemnity argument we have rejected. Moreover, just as the Engineers would have had to "reimburse" IBS had IBS prevailed, IBS must "reimburse" the Engineers after it lost. Had IBS won, but not paid its lawyers (due to a dispute, financial difficulty or some other reason), we do not think it would have foregone seeking an award of fees because the Engineers had nothing for which to "reimburse" IBS.

A case discussed at oral argument is instructive. In *Beverly Hills Properties v. Marcolino* (1990) 221 Cal.App.3d Supp. 7 [270 Cal.Rptr. 605], a landlord sued its tenant, who obtained pro bono representation. The tenant prevailed and the trial court awarded fees. (*Id.* at p. Supp. 9.) The lease had the following sentence after a standard attorney fees clause: " 'If the attorney for the successful party is not going to charge such successful party, then the successful party shall not be entitled to an award of attorneys fees.' " (*Id.* at p. Supp. 10.) As a matter of contract interpretation, the tenant was not entitled to fees, since such fees exceeded the limitation contained in the agreement. The court rejected such attempt to undermine a signal purpose of section 1717, which is to protect litigants in an economically disadvantageous position: "Section 1717 does not expressly require the prevailing party to incur legal expenses. The statute simply provides that a prevailing party is entitled to attorney fees and costs, '*which are incurred* to enforce that

contract.' (§ 1717, subd. (a), italics added.) [¶] Thus, the statute is ambiguous. It does not state who, the prevailing party or the attorney representing him, must incur the legal fees and costs." (221 Cal.App.3d at p. Supp. 11.) The court considered the purposes of the statute (mutuality of remedy and to prevent oppressive use of fee provisions) and concluded "These two purposes compel us to interpret section 1717 to provide a reciprocal remedy for a prevailing party who has not actually incurred legal fees, but whose attorneys have incurred costs and expenses in defending the prevailing party on the underlying agreement. Had appellant (the landlord) prevailed in this action, respondent clearly would have been liable for attorney fees . . . . Since respondent prevailing instead, he, too, may recover attorney fees pursuant to section 1717. [¶] Moreover, the award of attorney fees under section 1717, as its purposes indicate, is governed by equitable principles. [Citation.] We know from our own experience reviewing landlord/tenant disputes on appeal that the person who is most likely to need and receive free legal services is the tenant, not the landlord. Appellant's interpretation would prevent many tenants from being entitled to attorney fees (under § 1717). . . . [¶] Equity will not allow such a result." (*Id.* at pp. Supp. 11-12; cited with approval by *PLCM Group, supra,* 22 Cal.4th at p. 1095.)

As a subsidiary point, IBS contends the trial court should not have awarded fees charged by NAC's patent counsel, Lothrop & West. No engagement letter was produced obligating the Engineers in any way to pay these fees. The Engineers contend all nonlitigation patent bills were excised from the cost bill. We conclude IBS fails to demonstrate error.

Included in the material before the trial court was a letter from the Boutin firm, as part of the informal discovery exchanged between counsel regarding fees. The letter states "Mike West sent his bills for work in the IBS *v.* NAC case to NAC for payment, and NAC paid the bills. Mr. West did the work for all the defendants, all of whom had responsibility to pay his bills." We fail to see why the absence of an engagement letter changes the result as to the West firm. Not all contracts for legal services are in writing, nor do they need to be in writing. Further, the Engineers were liable, based on a quantum meruit theory, for services rendered on their behalf, even if there was no legal services contract. The trial court was entitled to credit counsel's statement all defendants were obliged to pay West's fees, even though NAC actually paid them. Therefore, the West firm fees are procedurally in the same posture as the Boutin firm fees, at least insofar as IBS's "incur" argument.

We are aware the West firm has merged into the Boutin firm. (See Sacramento Lawyer (Mar. 2000) *Boutin, Dentino Adds Two Generations of*

*Intellectual Property Lawyers,* p. 15.) This plays no part in our decision. Further, in light of our conclusion we need not consider the fact the Engineers actually own a large percentage of NAC, nor the validity, *vel non,* of any claim NAC may have against them in the event they do not reimburse NAC.

III*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The postjudgment order awarding fees is affirmed. IBS is to pay the Engineers' costs of appeal.

Sims, Acting P. J., concurred.

**RAYE, J.**—I concur in the result, but dissent from part I.C of the opinion.

Plaintiff International Billing Services, Inc. (IBS) sought attorney fees under a contractual provision, which, we have concluded, authorizes their award in lawsuits by IBS to prevent the wrongful disclosure of information by defendants (the Engineers). As the majority opinion properly concludes, while the contractual provision as written is one sided and restricts the award of fees to IBS as the prevailing plaintiff, the reciprocity provisions of Civil Code section 1717 operate in such a circumstance to permit the award of fees to the prevailing defendants—the Engineers—as well.

However, the majority opinion does not stop with this pronouncement. While claiming respect for the views of the legal commentator Bernard Witkin, it proceeds to commit a sin eschewed by him: "Have opinion, need case." (See Witkin, Manual on Appellate Court Opinions (1977) Special Problems of Appellate Review, § 85, p. 155.) This case thus becomes the occasion to opine on an issue that, in light of our conclusion that the contract herein authorizes the award of fees to the prevailing party, is not dispositive.

I confess to the same temptation. The majority opinion accurately reflects our collective frustration with litigation over attorney fees. Nevertheless, I would prefer that we yield not to this temptation and, assuming we surrender, that we articulate a rule of reason. I fear the majority opinion fails on both accounts.

*See footnote, *ante,* page 1175.

In a series of cases cited in the majority opinion, appellate courts have considered the operation of Civil Code section 1717 where the contract containing the attorney fees clause is determined to be unenforceable or otherwise nonbinding on the defendant. In *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124 [158 Cal.Rptr. 1, 599 P.2d 83] (*Reynolds*), the court recognized that the individual defendants, though nonsignatories to a note with an attorney fees clause, were nevertheless entitled to recover attorney fees. The court reasoned that the defendants would have been liable for attorney fees had the plaintiff prevailed in establishing alter ego liability and thus were themselves entitled to an award of fees as the prevailing party.

The entitlement to attorney fees has been recognized " 'even when the party prevails on grounds the contract is . . . nonexistent, . . .' [Citations.]" *Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 [39 Cal.Rptr.2d 824, 891 P.2d 804] (*Hsu*). However, *Hsu* and other cases recognizing such an entitlement—*Santisas v. Goodin* (1998) 17 Cal.4th 599 [71 Cal.Rptr.2d 830, 951 P.2d 399] (*Santisas*); *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101 [51 Cal.Rptr.2d 286] (*Abdallah*); *Care Constr., Inc. v. Century Convalescent Centers, Inc.* (1976) 54 Cal.App.3d 701, 704-706 [126 Cal.Rptr. 761]—were all cases, like *Reynolds, supra,* 25 Cal.3d 124, in which claims for attorney fees were asserted under a contract containing an attorney fees clause.

In *Hsu*, the contractual document at issue contained an attorney fees provision that clearly would have applied. The dispute centered on whether the plaintiffs' acceptance of a counteroffer was effective to break a binding agreement. The plaintiffs "appear[ed] to concede that the validity or existence of the contract alleged in their complaint [was] not a prerequisite to an award of attorney fees . . . ." (*Hsu, supra,* 9 Cal.4th at p. 870.) In *Abdallah, supra,* 43 Cal.App.4th 1101, the son of the contracting parties, who claimed to be their agent, sued for breach of contract and sought attorney fees under a provision that clearly provided for such an award. Similarly, in *Santisas, supra,* 17 Cal.4th 599, the existence of a valid attorney fees provision was not disputed.

These cases establish the principle that an attorney fees provision in a contract will be enforced even in litigation ending with a determination that the contract is not binding. They are not premised on estoppel principles and do not create a right to attorney fees where none would otherwise exist.

The opinion laments (maj. opn., *ante,* at p. 1187) the "wasteful consumption of judicial resources and client money" resulting from protracted litigation over whether a given provision is a fees provision. I question how much

money and resources are devoted to litigating such a narrow issue. There is certainly no indication the parties and courts involved in the present matter wasted an inordinate amount of resources in resolving a fairly simple issue of contract interpretation. In any event, would money and resources be any better spent bickering over judicial estoppel? If the present case is a portent, it appears the parties could well expend as much energy on the question of whether plaintiff really did assert a right to fees under the contractual provision (thereby invoking the newly minted estoppel doctrine) as on the question of what the provision really means.

The majority opinion observes (maj opn., *ante*, at p. 1189), "The *point* of an estoppel is to prevent a party from litigating an issue." And therein lies the vice of applying the doctrine to disputes concerning the interpretation of a contractual provision. Not all litigation is bad. Rational disputes concerning the proper construction of a contractual provision *should* be litigated. A party asserting that a contractual provision authorizes the award of attorney fees takes a calculated risk that the court may agree the contract authorizes fees but nonetheless find in favor of the defendant on the underlying claim. That risk is a sufficient deterrent to reckless claims. Little purpose is served by foreclosing the plaintiff from altering a legal position once taken any more than the prevailing defendant should be foreclosed from altering its position and, upon winning a contractual dispute, agreeing for the first time that a disputed provision does indeed authorize an award of attorney fees. In both instances, the court should determine the meaning of the contract independently as a matter of law although the previously expressed positions of the parties will not be ignored. The extreme sanction of estoppel is unnecessary.

The majority opinion invokes *Reynolds, supra,* 25 Cal.3d 124 for the proposition that "the mere threat of an attorney fees award alters the dynamics of litigation." (Maj. opn., *ante*, at p. 1191.) However, the threat considered by the court in *Reynolds* only existed in the absence of reciprocity, as where a contract limits recovery of attorney fees to one of the contracting parties. That evil is solved by the provisions of Civil Code section 1717. The mere threat of attorney fees does not radically alter the dynamic of litigation where the attorney fees remedy is mutual.

Although acknowledging that parties are permitted to plead alternative and inconsistent theories, the majority opinion (maj opn., *ante*, at p. 1188) deplores the "*in terrorem* effect of uncertainty" which results when parties are uncertain about their liability for fees. Litigation, by its very nature, is risky and uncertain. The opinion offers no compelling reason why we should

abide uncertainty in the resolution of certain issues—even to the extent of permitting parties to plead inconsistent theories—while deploring uncertainty on the interpretation of contractual provisions relating to attorney fees.

We have properly concluded that the contract herein contains a provision authorizing the award of attorney fees to IBS in litigation brought to prevent the wrongful disclosure of information by the Engineers. This one-sided contractual right to attorney fees is made reciprocal by the provisions of Civil Code section 1717. As the prevailing party, the Engineers are thus entitled to recover attorney fees. No more need be said. The discussion of judicial estoppel is both unnecessary and ill-advised.